IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**MISC 08      553**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

NOV 18 2008

BROOKLYN OFFICE

G. M. SIGN, INC., an Illinois corporation, individually and as the representative of a class of similarly-situated persons,

              Plaintiff,

v.

FINISH THOMPSON, INC.,

              Defendant.

:
:
:
:
:
:
:
:
:
X

**AFFIDAVIT OF DAVID A. PAUL, ESQ. IN SUPPORT OF ORDER TO SHOW CAUSE TO COMPEL COMPLIANCE WITH A SUBPOENA**

[Case No. 07 C 5953
**Pending in U.S. District Court
for the Northern District of Illinois**]

STATE OF NEW YORK      )
                   ) ss.:
COUNTY OF NEW YORK  )

**MATSUMOTO, J.**

DAVID A. PAUL, being duly sworn, deposes and says:

1.     I am an associate with the firm Leader & Berkon LLP, attorneys for Plaintiff, G.M. SIGN, INC., and I am duly admitted to practice law before the United States District Court for the Eastern District of New York. I am familiar with the facts and circumstances of this case.

2.     I make this affidavit in support of Plaintiff's application by Order to Show Cause for an order compelling Caroline Abraham to provide certain information responsive to a subpoena for records and deposition issued by this Court, and alternatively, holding Caroline Abraham in contempt of court for failing to comply with the subpoena pursuant to Federal Rule of Civil Procedure 45(e).

3.     On August 16, 2007, Plaintiff filed a class action lawsuit in the Circuit Court of Lake County, Illinois on behalf of a class of persons to which Defendant

sent advertisements by fax without the recipients' prior express permission or invitation, alleging violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. A copy of the Class Action Complaint is attached hereto as Exhibit A.

4.     On October 22, 2007, Defendant removed the case to the United States District Court for the Northern District of Illinois, Eastern Division as of right pursuant to 28 U.S.C. § 1332(d)(2).

5.     Discovery in this case has revealed that Defendant created a form advertisement and hired Business to Business Solutions, a company owned by Caroline Abraham, to fax the advertisements to businesses without first obtaining their permission.

6.     On July 25, 2008, Plaintiff's counsel served a subpoena for records and deposition on Caroline Abraham at her residence in Brooklyn, NY. A copy of the subpoena dated July 7, 2008 is attached hereto as Exhibit B.

7.     Prior to the deposition, Ms. Abraham produced certain, but not all, documents responsive to the subpoena.

8.     On September 16, 2008, Abraham appeared for deposition in Brooklyn, NY. A copy of the Abraham deposition transcript is attached hereto as Exhibit C. During the deposition, Ms. Abraham was asked questions regarding documents requested in the subpoena. In response, Ms. Abraham testified that she would provide additional information responsive to the subpoena, including the numbers of telephone lines used in the alleged advertising scheme:

Q:     Do you have records concerning the phone lines, 20 or 30, that you maintained back at the time these faxes were allegedly sent?

**A:     I don't know. I'd have to search through old phone lines and figure it out.**

Q:   Can you tell me the phone numbers of the lines that you used in connection with this Business to Business fax?

**A:   There were many of them.  I don't remember them.  I have old phone bills.  Maybe I could dig them up.**

Q:   If I asked you what phone company you used to have these faxes sent out in October 2005, what would your answer be?

**A:   I'd have to look through bank records, my file cabinet.**

**Q:**   Can you find the numbers that you were using in October of '05 by finding the payment of the bill, whether on-line or by check, that you received after the time that these faxes were sent out?

**A:   It's very likely.**

Q:   And you agreed that as part of your responsibilities in this subpoena in this proceeding that you will go home and take reasonable steps to find out what records you have and to reveal them to [the parties]?

**A:   Yes, reasonable, yes.**

Q:   That you are under the requirement of our request in this process through this subpoena –

**A:   I understand.**

Q:   -- to search for what records you have, and be able to tell us what you got, and what you're going to get or how we're going to have to get it; okay?

**A:   Correct.**

pg. 48, lines 10-15; pgs. 61-62, lines 22-25, 1-2; pg. 63, lines 1-12; pgs. 70-71, lines 20-25, 1-3; pg. 79, lines 16-22; pg. 80, lines 11-19.

8.      The documents related to the telephone lines are relevant and necessary as the telephone records and other documents will show to whom the faxes were sent.  This information is crucial for Plaintiff to establish numerosity and damages in the pending litigation.

9.      On three separate occasions in October 2008, Plaintiff's counsel, Ryan M. Kelly, Esq. of Anderson & Wanca, contacted Ms. Abraham by e-mail asking her to comply with the subpoena for records.  Copies of the e-mail messages are attached hereto as Exhibit D.  Also, during that time, Plaintiff's counsel attempted to contact Ms.

Abraham by telephone and left several messages, but she refused to answer or to return his calls.

       10.    All of the October 2008 communications have been ignored, and no documents have been produced by Ms. Abraham subsequent to the deposition, nor has Ms. Abraham informed the parties that she is not in custody or control of the requested documents.

       11.    Accordingly, Plaintiff respectfully requests that this Court issue an Order compelling Caroline Abraham to produce all documents and provide all outstanding information as articulated in the e-mail from Plaintiff's counsel dated October 6, 2008, all of which is responsive to the subpoena, and alternatively holding Caroline Abraham in contempt of court for failing to comply with the subpoena pursuant to Federal Rule of Civil Procedure 45(e), and for any other relief this Court deems just and proper.

                                                          DAVID A. PAUL (DP-7629)

Sworn to before me this
18th day of November, 2008.

Notary Public

CAROLINE C. MARINO
Notary Public, State of New York
No. 02MA6168740
Qualified in New York County
Commission Expires June 18, 2011

4

## IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

G.M. SIGN, INC., an Illinois corporation,    )
individually and as the representative of a    )
class of similarly-situated persons,    )
   )
            Plaintiff,    )
   )
      v.    )
   )
FINISH THOMPSON, INC.,    )
   )
        Defendant.    )

**07 CH 2 0 8 7**

**FILED**

**AUG 16 2007**

### CLASS ACTION COMPLAINT

Plaintiff, G.M. SIGN, INC. ("Plaintiff"), brings this action on behalf of itself and all

persons similarly situated, through its attorneys, and except as to those allegations pertaining to

Plaintiff or its attorneys, which allegations are based upon personal knowledge, alleges the

following upon information and belief against Defendant, FINISH THOMPSON, INC.

("Defendant"):

### PRELIMINARY STATEMENT

1.      This case challenges Defendant's practice of faxing unsolicited advertisements.

2.      The federal Telephone Consumer Protection Act, 47 USC § 227, prohibits a

person or entity from faxing or having an agent fax advertisements without the recipient's prior

express invitation or permission ("junk faxes" or "unsolicited faxes"). The TCPA provides a

private right of action and provides statutory damages of $500 per violation.

3.      Unsolicited faxes damage their recipients. A junk fax recipient loses the use of its

fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's valuable time that

would have been spent on something else. A junk fax interrupts the recipient's privacy.

Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for



authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

4.      On behalf of itself and all others similarly situated, Plaintiff brings this case as a class action asserting claims against Defendant under the TCPA, the common law of conversion, and the consumer protection statutes forbidding and compensating unfair business practices.

5.      Plaintiff seeks an award of statutory damages for each violation of the TCPA.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred by 735 ILCS 5/2-209 in that Defendant has transacted business and committed tortious acts related to the matters complained of herein.

7.      Venue is proper in Lake County pursuant to 735 ILCS 5/2-101, et seq. because some of the tortious acts complained of occurred in Lake County, Illinois.

8.      Federal jurisdiction does not exist because no federal question or claim is asserted and Plaintiffs' individual claims are worth less than $75,000.00, inclusive of all forms of damages and fees.  Plaintiff expressly disclaims any individual recovery in excess of $75,000.00, inclusive of all forms of damages and fees.

## PARTIES

9.      Plaintiff is an Illinois corporation with its principal place of business in Lake County, Illinois.

10.     On information and belief, Defendant, FINISH THOMPSON, INC., is a Pennsylvania corporation with its principal place of business in Erie, Pennsylvania.

## FACTS

11.     On or about October, 2005, Defendant faxed an advertisement to Plaintiff.  A copy of the facsimile is attached hereto as Exhibit A.

12.   Plaintiff had not invited or given permission to Defendant to send those fax advertisements.

13.   On information and belief, Defendant faxed the same and similar advertisements to Plaintiff and more than 39 other recipients without first receiving the recipients' express permission or invitation.

14.   There is no reasonable means for Plaintiff (or any other class member) to avoid receiving illegal faxes. Fax machines are left on and ready to receive the urgent communications their owners desire to receive.

<div align="center">

**COUNT I**
**TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227**

</div>

15.   Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

16.   In accordance with 735 ILCS 5/2-801, Plaintiff brings Count I pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, on behalf of the following class of persons:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendant, (3) with respect to whom Defendant cannot provide evidence of prior express permission or invitation for the sending of such faxes.

17.   A class action is warranted because:

(a)   On information and belief, the class includes forty or more persons and is so numerous that joinder of all members is impracticable.

(b)   There are questions of fact or law common to the class predominating over questions affecting only individual class members, including without limitation:

(i)   Whether Defendant sent unsolicited fax advertisements;

<div align="center">3</div>

    (ii)    Whether Defendant's facsimiles advertised the commercial availability of property, goods, or services;

    (iii)    The manner and method Defendant used to compile or obtain the list of fax numbers to which it sent Exhibit A and other unsolicited faxed advertisements;

    (iv)    Whether Defendant faxed advertisements without first obtaining the recipients' express permission or invitation;

    (v)    Whether Defendant violated the provisions of 47 USC § 227;

    (vi)    Whether Plaintiff and the other class members are entitled to statutory damages;

    (vii)    Whether Defendant should be enjoined from faxing advertisements in the future; and

    (viii)    Whether the Court should award trebled damages.

18.    Plaintiff will fairly and adequately protect the interests of the other class members. Plaintiff's counsel are experienced in handling class actions and claims involving unsolicited advertising faxes. Neither Plaintiff nor Plaintiff's counsel has any interests adverse or in conflict with the absent class members.

19.    A class action is an appropriate method for adjudicating this controversy fairly and efficiently. The interest of each individual class member in controlling the prosecution of separate claims is small and individual actions are not economically feasible.

20.    The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227(b)(1).

4

21.   The TCPA defines "unsolicited advertisement," as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227(a)(4).

22.   The TCPA provides:

> 3.   <u>Private right of action</u>.  A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:
>
> > (A)   An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
> >
> > (B)   An action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
> >
> > (C)   Both such actions.

23.   The Court, in its discretion, can treble the statutory damages if the violation was knowing.  47 U.S.C. § 227.

24.   Defendant violated the 47 U.S.C. § 227 et seq. by sending advertising faxes (such as Exhibit A) to Plaintiff and the other members of the class without first obtaining their prior express invitation or permission.

25.   The TCPA is a strict liability statute and Defendant is liable to Plaintiff and the other class members even if its actions were only negligent.

26.   Defendant knew or should have known that Plaintiff and the other class members had not given express invitation or permission for Defendant or anybody else to fax advertisements about Defendant's goods or services.

27.   Defendant's actions caused damages to Plaintiff and the other class members. Receiving Defendant's junk faxes caused the recipients to lose paper and toner consumed in the

printing of Defendant's faxes. Moreover, Defendant's faxes used Plaintiff's fax machine. Defendant's faxes cost Plaintiff time, as Plaintiff and its employees wasted their time receiving, reviewing and routing Defendant's illegal faxes. That time otherwise would have been spent on Plaintiff's business activities. Finally, Defendant's faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone.

28.     Even if Defendant did not intend to cause damage to Plaintiff and the other class members, did not intend to violate their privacy, and did not intend to waste the recipients' valuable time with Defendant's advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

WHEREFORE, Plaintiff, G.M. SIGN, INC., individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendant, FINISH THOMPSON, INC., as follows:

A.     That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.     That the Court award $500.00 in damages for each violation of the TCPA;

C.     That the Court enter an injunction prohibiting Defendant from engaging in the statutory violations at issue in this action; and

D.     That the Court award costs and such further relief as the Court may deem just and proper, but in any event, not more than $75,000.00 per individual, inclusive of all damages and fees.

## COUNT II
## CONVERSION

29.     Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

30.     In accordance with 735 ILCS 5/2-801, Plaintiff brings Count II for conversion

under the common law for the following class of persons:

> All persons (1) who on or after a date five years prior to the filing
> of this action, (2) were sent telephone facsimile messages of
> material advertising the commercial availability of any property,
> goods or services by or on behalf of Defendant, (3) with respect to
> whom Defendant cannot provide evidence of prior express
> permission or invitation for the sending of such faxes.

31.     A class action is proper in that:

    (a)     On information and belief the class consists of forty or more persons and

is so numerous that joinder of all members is impracticable.

    (b)     There are questions of fact or law common to the class predominating over

all questions affecting only individual class members, including:

        (i)     Whether Defendant engaged in a pattern of sending unsolicited fax

advertisements;

        (ii)     The manner and method Defendant used to compile or obtain the

list of fax numbers to which it sent Exhibit A and other unsolicited faxed

advertisements; and

        (iii)     Whether Defendant committed the tort of conversion.

32.     Plaintiff will fairly and adequately protect the interests of the other class

members.  Plaintiff has retained counsel who is experienced in handling class actions and claims

involving unlawful business practices.  Neither Plaintiff nor Plaintiff's counsel have any interests

adverse or in conflict with the class.

33.     A class action is an appropriate method for adjudicating this controversy fairly

and efficiently.  The interest of the individual class members in individually controlling the

prosecution of separate claims is small and individual actions are not economically feasible.

34.    By sending Plaintiff and the other class members unsolicited faxes, Defendant improperly and unlawfully converted their fax machines, toner and paper to its own use. Defendant also converted Plaintiff's employees' time to Defendant's own use.

35.    Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other class members owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

36.    By sending the unsolicited faxes, Defendant permanently misappropriated the class members' fax machines, toner, paper, and employee time to Defendant's own use. Such misappropriation was wrongful and without authorization.

37.    Defendant knew or should have known that its misappropriation of paper, toner, and employee time was wrongful and without authorization.

38.    Plaintiff and the other class members were deprived of the use of the fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each class member thereby suffered damages as a result of their receipt of unsolicited fax advertisements from Defendant.

39.    Each of Defendant's unsolicited fax advertisements effectively stole Plaintiff's employees' time because multiple persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendant's illegal faxes. Defendant knew or should have known employees' time is valuable to Plaintiff.

40.    Defendant's actions caused damages to Plaintiff and the other members of the class because their receipt of Defendant's unsolicited fax advertisements caused them to lose paper and toner as a result. Defendant's actions prevented Plaintiff's fax machines from being used for Plaintiff's business purposes during the time Defendant was using Plaintiff's fax

8

(a)     On information and belief the class consists of thousands of persons in Illinois and throughout the United States and is so numerous that joinder of all members is impracticable.

(b)     There are questions of fact or law common to the class predominating over all questions affecting only individual class members including:

(i)     Whether Defendant engaged in a pattern of sending unsolicited fax advertisements;

(ii)    The manner and method Defendant used to compile or obtain the list of fax numbers to which it sent Exhibit A and other unsolicited faxed advertisements;

(iii)   Whether Defendant's practice of sending unsolicited faxed advertisements violates Illinois public policy;

(iv)    Whether Defendant's practice of sending unsolicited faxes is an unfair practice under the Consumer Fraud Act; and

(v)     Whether Defendant should be enjoined from sending unsolicited fax advertising in the future.

44.     Plaintiff will fairly and adequately protect the interests of the other class members.  Plaintiff has retained counsel who are experienced in handling class actions and claims involving lawful business practices.  Neither Plaintiff nor Plaintiff's counsel have any interests adverse or in conflict with the class.

45.     A class action is an appropriate method for adjudicating this controversy fairly and efficiently.  The interest of the individual class members in individually controlling the prosecution of separate claims is small and individual actions are not economically feasible.

46.     Defendant's unsolicited fax practice is an unfair practice, because it violates public policy, and because it forced Plaintiff and the other class members to incur expense without any consideration in return.  Defendant's practice effectively forced Plaintiff and the other class members to pay for Defendant's advertising campaign.

47.     Defendant violated the unfairness predicate of the Act by engaging in an unscrupulous business practice and by violating Illinois statutory public policy, which public policy violations in the aggregate caused substantial injury to hundreds of persons.

48.     Defendant's misconduct caused damages to Plaintiff and the other members of the class, including the loss of paper, toner, ink, use of their facsimile machines, and use of their employees' time.

49.     Defendant's actions caused damages to Plaintiff and the other class members because their receipt of Defendant's unsolicited fax advertisements caused them to lose paper and toner consumed as a result.  Defendant's actions prevented Plaintiff's fax machine from being used for Plaintiff's business purposes during the time Defendant was using Plaintiff's fax machine for Defendant's illegal purpose.  Defendant's actions also cost Plaintiff employee time, as Plaintiff's employees used their time receiving, routing, and reviewing Defendant's illegal faxes and that time otherwise would have been spent on Plaintiff's business activities.

WHEREFORE, Plaintiff, G.M. SIGN,, INC., individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendant, FINISH THOMPSON, INC., as follows:

A.     That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the class representative, and appoint Plaintiff's counsel as counsel for the class;

11

 

B.      That the Court award damages to Plaintiff and the other class members;

C.      That the Court award attorney fees and costs;

D.      That the Court enter an injunction prohibiting Defendant from sending unsolicited

faxed advertisements to Illinois consumers; and

E.      Awarding such further relief as the Court may deem just and proper, but in any

event, not more than $75,000.00 to any individual member.

Respectfully submitted,

G.M. SIGN, INC., individually and as the
representative of a class of similarly-situated
persons

By: _____
One of Plaintiff's Attorneys

Brian J. Wanca                          Phillip A. Bock (#6224502)
ANDERSON + WANCA                        DIAB & BOCK, LLC
3701 Algonquin Road, Suite 760          134 N. La Salle St., Suite 1000
Rolling Meadows, IL  60008              Chicago, IL  60602
Telephone:  847/368-1500                Telephone:  312/578-4100
Attorney No. 3126474

**EXHIBIT A**

 



## *Finish Thompson Inc*
921 Greengarden Road*Erie*PA*16501-1591 U.S.A
Ph 814-455-4478* Fax 814-455-8518
Email fti@finishthompson.com * www.finishthompson.com



# Attention
# Manufacturers

# Solvent
# 10¢ a Gallon

## Sound Impossible?

*Revolutionary System
Recycles Solvent on Site for
10 ¢ A Gallon*



# For Details, Call Toll Free
# (800) 264-3898, Ext 350

_____ The above sponsor is not affiliated with, nor endorsed by, any charitable organization _____

## Please Contribute to Reputable American Charities Dedicated to Helping Flood Victims

Advertising stimulates the economy. If you did not make your fax number available, this message was sent in error and we apologize. If you do not want to receive charitable advertising or other faxes, call (718) 645-2018, Ext 233, twenty four-hours a day, seven days a week or 8009919484, ext 399. (Lines less busy evenings, nights, and weekends) (Calling or faxing other numbers or extensions will not result in removal.) This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Buc, Rom, 050183, 40723294564, which is solely responsible for its contents and destination. For Customer Service or Information, call 24/7, The Complaint HOT LINE (718) 645-2021, Ext 232.

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | NEW YORK |
| --- | --- | --- |

G.M. SIGN

V.

FINISH THOMPSON

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07 C 5953    (pending in the
United States District Court for
Northern District of Illinois)

TO:  Caroline Abraham, 1601 E. 18th Street, Brooklyn, NY 11230

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Esquire Court Reporters, 16 Court Street, Suite 1902, Brooklyn, NY 11241 | DATE AND TIME  8/26/2008 10:00 am |
| --- | --- |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Rider Attached.

| PLACE   Law Offices of Anderson + Wanca, 3701 Algonquin Rd., Suite 760, Rolling Meadows, IL 60008 | DATE AND TIME  8/8/2008 10:00 am |
| --- | --- |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]* for Plaintiff | 7/9/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Ryan M. Kelly, Anderson + Wanca, 3701 Algonquin Rd., Suite 760, Rolling Meadows, IL 60008
Telephone: (847) 368-1500

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

# EXHIBIT A

1.  All documents containing communication with David H. Hansen d/b/a DLH Insurance ("Defendant") and any of its agents or employees.

2.  All documents, telephone records, or computer records sufficient to identify the fax numbers, names, and addresses of persons or entities to whom you, on behalf of the businesses sent or caused to be sent any fax advertisement for the period of February 9, 2003 to present, and whether the fax transmissions were successful or received.

3.  All information provided to you by the Defendant and any of its agents or employees.

4.  All records, whether written, recorded, or electronic, which indentify or show when the fax transmissions were sent.

5.  All documents, telephone records, or computer records which contain the lists used to send or transmit the advertisements.

6.  All cancelled checks, contracts, invoices, or service orders evidencing the purchase of names and fax numbers which were utilized to send or transmit the fax advertisements.

7.  All documents which describe the manner in which the lists of telephone numbers to which the fax advertisements were sent, were compiled, and maintained.

8.  The logs of individuals who gave prior express permission or invitation to receive the fax advertisements.

9.  All documents which describe the manner in which you maintained records relating to the transmission of fax advertisements for or on behalf of the Defendant.

10. All documents, telephone records, or computer records, which contain, describe, or specify complaints or objections from recipients of the Defendant's advertisements.

## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| G.M. SIGN | ) Case No.: 07 CV 5953 |
| | ) |
| | ) Court Date: Aug. 27, 2008 at 10:00 AM |
| **Plaintiff** | ) |
| v. | ) |
| | ) |
| FINISH THOMPSON | ) **ATTY:** |
| | ) ANDERSON + WANCA, Attorneys at Law |
| | ) 3701 Algonquin Road, Suite 760 |
| **Defendant** | ) Rolling Meadows, IL 60008 |

### AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Kings      ss:

I, Harry Bass, being duly sworn deposes and says deponent is not a party to this action, I am over the age of eighteen years and reside in the state of New York.

That on July 25, 2008 at 1:51 PM at 1601 East 18th Street, Brooklyn, NY 11230, deponent served the within Subpoena in a Civil Case on Caroline Abraham therein named (the intended recipient). To A SUITABLE AGE PERSON:  By delivering a true copy of each to Ralph Abraham, the Husband of Caroline Abraham, a person of suitable age and discretion.  Said premises is intended recipient's residence within the state of New York

DESCRIPTION: Deponent further states that the description of the person actually served is as follows:

Gender: Male    Race/Skin: White    Hair: White    Glasses: No    Age: 55    Height: 5'6    Weight: 175

Deponent also enclosed a copy of same in an official depository under the exclusive care and custody of the U.S. Postal Services within NY state. The envelope(s) bore the legend "PERSONAL & CONFIDENTIAL" and did not indicate on the outside thereof by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

To:  Caroline Abraham On: 7/28/2008 To: 1601 East 18th Street, Brooklyn, NY 11230

COMMENTS: $35.00 Subpoena fee was supplied. Attorney Ck #12602

MILITARY SERVICE:  Deponent asked person spoken to whether the recipient was presently in the military service of the United States Government or on active duty in the military service in the state of New York and was informed he/she was not. The person spoken to also admitted to the recepient is not dependant upon anyone in the Military Service of the United States or of the State of New York.

I declare under penalties of perjury that the information contained herein is correct to the best of my knowledge.

Harry Bass, Lic. #1076668

Executed on: 7/28/08

Subscribed and sworn to before me, a notary public, on this 28th day of July, 2008.

Notary Public                              My Commission Expires:

MARIA I. BASS
Notary Public, State of New York
No. 01BAE157290
Qualified in Kings County
Commission Expires March 22, 2011

ID: 08-008268

Client Reference: GM Sign v Finish



1

2   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
3   EASTERN DIVISION
    ------------------------------------------X
4
    GM SIGN, INC.
5
                              PLAINTIFF,
6
7        - against -          CASE NO.:
                              06CH27638
8
    FINISH THOMPSON, INC.
9
                              DEFENDANT.
10  ------------------------------------------X

11              DATE:   September 16, 2008

12              TIME:   9:43 a.m.

13

14

15          VIDEOTAPE DEPOSITION OF CAROLINE

16  ABRAHAM, a nonparty witness, taken by the

17  Plaintiff, pursuant to a Court Order, held at

18  the offices of Diamond Reporting, 16 Court

19  Street, Suite 907, Brooklyn, New York 11241,

20  before a Notary Public of the State of New

21  York.

22

23

24

25

2



2        A P P E A R A N C E S:

3

4        ANDERSON & WANCA, ESQS.
              Attorneys for Plaintiff
5             3701 Algonquin Road, Suite 760
              Rolling Meadows, Illinois 60008
6             BY:  RYAN M. KELLY, ESQ.

7

8

        STEPHEN J. SCHLEGEL LTD.
9             Attorneys for Defendant
              111 West Washington Street, Suite 1020
10            Chicago, Illinois 60602
              BY:  STEPHEN J. SCHLEGEL, ESQ.

11

12

13       ALSO PRESENT:

14                    KATHY PASCHAL
                      Videographer
15                    Diamond Reporting & Legal Video

16

17

18

19

20

21

22

23

24

25

3



```
 1                      ABRAHAM
 2            (Whereupon, a series of documents
 3       were pre-marked Plaintiff's Exhibits 1
 4       through 8 for identification by the
 5       Reporter, as of this date.)
 6            THE VIDEOGRAPHER:  My name is Kathy
 7       Paschal of Diamond Reporting.
 8            Today's date is September the 16th,
 9       2008.  The time is approximately 9:43 a.m.
10            This is Tape Number 1.  This
11       deposition is being held in the office of
12       Diamond Reporting, located at 16 Court
13       Street, Brooklyn, New York.  The caption
14       of the case is GM Sign, Incorporated,
15       versus Finish Thompson, Incorporated, in
16       the United States District Court of the
17       Northern District of Illinois, Eastern
18       Division.
19            The name of the witness is
20       Mrs. Caroline Abraham.
21            At this time, would the attorneys
22       please identify themselves and the parties
23       they represent?
24            MR. KELLY:  My name is Ryan Kelly
25       and I represent the plaintiff, GM Sign.
```

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

4

```
1                         ABRAHAM
2              MR. SCHLEGEL:  I am Steve Schlegel.
3      I represent Finish Thompson, Incorporated,
4      the Defendant.
5              THE VIDEOGRAPHER:  Will the Court
6      Reporter please identify himself and swear
7      in the witness.
8              THE REPORTER:  My name is Leonard
9      Sweet.  I am a Court Reporter with Diamond
10     Reporting.
11     C A R O L I N E    A B R A H A M,    called as a
12     witness, having been first duly affirmed by a
13     Notary Public of the State of New York, was
14     examined and testified as follows.
15             THE VIDEOGRAPHER:  You may proceed.
16     EXAMINATION BY
17     MR. KELLY:
18         Q.    Can you state your name for the
19     record, please?
20         A.    Caroline Abraham.
21         Q.    Ms. Abraham, my name is Ryan Kelly.
22     I represent the plaintiff in this case.
23             Before I start asking you some
24     questions, I want to make sure that you know
25     some of the ground rules, because there's a
```



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

5

```
 1                        ABRAHAM
 2    Court Reporter here and there's a Videographer
 3    here.
 4              What I ask of you is to allow me to
 5    finish asking the question before you give an
 6    answer to it, because the Court Reporter can
 7    only take down what one person says at one
 8    time.  If we start talking over each other, the
 9    Court Reporter has a hard time taking down my
10    full question and your full answer.
11              Do you understand that?
12         A.    Yes.
13         Q.    There maybe a time where I'm going
14    to ask a question that you don't either
15    understand or you just didn't here.  In
16    situations like that, just ask me to either
17    rephrase or restate the question and I'll be
18    happy to do that; okay?
19         A.    Okay.
20         Q.    I don't want you to give an answer
21    to a question that you didn't understand.  That
22    doesn't help anybody here.
23              Do you understand that?
24         A.    Yes.
25         Q.    If you do give an answer to a
```

6

ABRAHAM

1
2      question that I do ask, I'm going to assume
3      that you understood the question; is that fair?
4          A.    That's fair.
5          Q.    If you need to take a break at any
6      time, just let us know and we can do that.
7          A.    Okay.
8          Q.    Are you currently employed?
9          A.    Yes.
10         Q.    By whom?
11         A.    White Glove Placement, Incorporated.
12         Q.    What is the address there?
13         A.    85 Bartlett Street, Brooklyn, New
14     York 11206.
15         Q.    What do you do there?
16         A.    Various -- various office
17     management.
18         Q.    What is your job title?
19         A.    Employment manager.
20         Q.    How long have you worked there?
21         A.    One year.
22         Q.    At some time, were you an owner of
23     company called Business to Business Solutions?
24         A.    Yes.
25         Q.    When is the first time you started


DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

7

1                           ABRAHAM
2     the company of Business to Business Solutions,
3     approximately?
4           A.    Either 2004 or 2005.  I'm not sure.
5           Q.    What was the business purpose of
6     that company?
7           A.    To service other companies.
8           Q.    How were you to service other
9     companies?
10          A.    Well, secretarial skills for one
11    thing.
12                The particular client that I think
13    you're interested in was out of the country, so
14    we provided services that they couldn't get
15    themselves in the United States, in particular,
16    phone lines and a method to receive payment.
17          Q.    Where did you operate Business to
18    Business Solutions?
19          A.    I, myself, worked in my own home.
20          Q.    What is the address of your home?
21          A.    The address then was 1869 East 23rd
22    Street, Brooklyn 11229.
23          Q.    Did you incorporate Business to
24    Business Solution --
25          A.    It wasn't actually incorporated --



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

8

ABRAHAM

1

2     I'm sorry to interrupt you.

3          Q.    Yes, because I'm not getting a full

4     question out.

5          A.    I'm sorry.

6          Q.    Okay. did you ever incorporate

7     Business to Business Solutions?

8          A.    No.

9          Q.    Did you have any other workers that

10    worked for Business to Business Solutions?

11         A.    No.

12         Q.    Did you work full-time for Business

13    to Business Solutions?

14         A.    Pretty close.

15         Q.    So, around 40 hours a week you would

16    do that?

17         A.    Yes.

18         Q.    Did Business to Business Solutions

19    ever have an outside office of any sort?

20         A.    Not an office, no.

21         Q.    When did Business to Business

22    Solutions cease operating, approximately?

23         A.    A little over a year ago.

24         Q.    Is that when you started at White

25    Glove?

9

1                        ABRAHAM

2        A.     Shortly before.

3        Q.     Why did Business to Business

4   Solutions cease operating?

5        A.     The particular job it had ended.

6        Q.     What do you mean "the particular" --

7        A.     The particular company I was working

8   with no longer used it.

9        Q.     What was the name of that particular

10  company?

11       A.     That was Macaw, S.R.L.

12              MR. SCHLEGEL:  How do you spell

13       Macaw?

14              THE WITNESS:  M-a-c-a-w, S.R.L.,

15       which I think means incorporated in

16       Romania.

17       Q.     Who were the owners of Macaw?

18       A.     I'm not sure.

19       Q.     Were you the only owner of Business

20  to Business Solutions?

21       A.     Yes.

22       Q.     Did you receive a subpoena for

23  records in this particular case?

24       A.     Yes.

25       Q.     Did you receive that subpoena from

10

1                          ABRAHAM

2    my law office?

3          A.    Yes.

4          Q.    Did you respond to the subpoena by

5    producing certain documents?

6          A.    Yes.

7          Q.    I'm going to show you documents that

8    have been Bates labeled GM/FT/BB1 through 11,

9    which have been marked Plaintiff's Exhibit 1

10   through 8, and I'm going to ask you to take a

11   look at these documents and tell me whether

12   those are the documents that you produced in

13   response to the subpoena.

14         A.    Yes.

15         Q.    How did you obtain the documents

16   that are marked as Plaintiff's Exhibit 1

17   through 8?

18         A.    Mostly from my computer and one out

19   of my bank accounts records.

20         Q.    Which exhibit did you retrieve from

21   your bank account records?

22         A.    The copy of the check.

23         Q.    Is it marked as an exhibit?

24         A.    Yes.

25         Q.    What exhibit number?



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

11

```
 1                          ABRAHAM
 2           A.    I'm looking for it.  Five.
 3           Q.    It's also Bates labeled GM/FT/BB7;
 4     is that right?
 5           A.    Oh, yes, yes, that's correct.
 6           Q.    What documents does Business to
 7     Business Solutions have that relate to its
 8     business operations?
 9           A.    Databases, copies of faxes received,
10     copies of advertising that we edited and made
11     up, and in some cases transmission records.
12           Q.    When you refer to "databases," what
13     types of databases?
14           A.    Access.
15           Q.    Is that a software program by --
16           A.    That's part of Microsoft Office's
17     set of programs.
18           Q.    What does Microsoft Access allow you
19     to do?
20           A.    Keep data in a database.
21           Q.    Did you use Microsoft Access to keep
22     data in the databases?
23           A.    Yes.
24           Q.    How did you store copies of the
25     advertisements and edited advertisements on
```

12

1                          ABRAHAM
2    your computer?
3         A.    Copies of advertisements were
4    written in Word, so we simply saved the Word
5    files.
6         Q.    How about the edited portions of the
7    advertisements, where there may be handwritten
8    remarks on them?
9         A.    Those came in by fax.  Faxes came in
10   through some e-fax service.
11        Q.    So, did you receive faxes through an
12   e-fax?
13        A.    Yes, something like that.
14        Q.    Did you save the faxes onto your
15   computer?
16        A.    Yes.
17        Q.    Did you organize the data by client?
18        A.    Yes.
19        Q.    So, in order to retrieve the
20   documents that have been marked Plaintiff's
21   Exhibit 1 through 8, did you review the file
22   folder relating to Finish Thompson?
23        A.    Yes.
24        Q.    Are the documents that have been
25   marked Plaintiff's Exhibit 1 through 8 the


DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

13

1                         ABRAHAM

2    types of documents that Business to Business

3    Solutions uses in its ordinary course of

4    business?

5           A.    Used to.

6           Q.    Used to?

7           A.    Yes.

8           Q.    I'm going to draw your attention to

9    Exhibit 1, which is a three-page document.

10          A.    Uh-huh.

11          Q.    Do you recognize this document?

12          A.    I printed this out, certain records,

13   out of the database that I maintain --

14   maintained.

15          Q.    Are you generally familiar with what

16   the column headings refer to?

17          A.    Yes.

18          Q.    The first column heading, it says,

19   "Client ID."  Do you see that?

20          A.    Yes.

21          Q.    And then there's a designation of

22   "J082902."  Do you see that?

23          A.    Yes.

24          Q.    What does that number refer to?

25          A.    That's the specific I.D. that was

14

1                        ABRAHAM
2      assigned to Finish Thompson.
3                   Do you want me to explain why we
4      made that ID.
5           Q.    Yes, please.
6           A.    "J" was the year that the client
7      first came to us.  That was 2005.
8                   "08" was August.
9                   "29" was the 29th of August.
10                  And "02" was the second customer who
11     signed up that day.
12          Q.    Who was responsible --
13          A.    I shouldn't say "signed up," I'm
14     sorry, but who --
15          Q.    Showed interest?
16          A.    Showed interest.  That's a good way
17     to say it.
18          Q.    Who was responsible for creating the
19     Client ID Number and putting it into Access?
20          A.    Sometimes -- sometimes I did,
21     sometimes -- I think more often the people at
22     Macaw did in Romania.
23          Q.    How did businesses first hear of the
24     opportunity to send out advertisements by fax?
25          A.    Mostly by fax advertisements.

       DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

15

1                              ABRAHAM
2            Q.     So, in other words, someone at Macaw
3     or on your end would send out an advertisement
4     by fax soliciting business to advertise by fax?
5            A.     Correct.
6            Q.     On the fax that is sent to the
7     various businesses, would there be a phone
8     number on that fax?
9            A.     I think so.
10           Q.     When somebody would receive the fax,
11    they can call that number; is that right?
12           A.     I think that's what was usually
13    done.
14           Q.     Who would answer on the other end?
15    Would it be you or somebody at Macaw?
16           A.     I think it was almost always voice
17    mails.
18           Q.     So, nobody would answer the phone
19    call, but at some time later on there would be
20    a telephone call back; is that right?       .
21           A.     Correct.
22           Q.     Would you call the people back?
23           A.     No.
24           Q.     It would be the people at Macaw?
25           A.     Yes.

16

ABRAHAM

1

2      Q.     Did Macaw also have access to the
3  Microsoft Access software program?
4      A.     Oh, yes.
5      Q.     How was it that both you and the
6  Macaw people had access?  Was it done by the
7  internet?
8      A.     Yeah, by the internet.
9      Q.     So, the Macaw people can enter date
10  into the database; is that right?
11      A.     Yes.
12      Q.     And you can view --
13      A.     Also enter data at the same time.
14  That's one that happens in Access, more than
15  one person can access the database at the same
16  time.
17      Q.     The second column, it says, "ID
18  Index."  Do you see that?
19      A.     Uh-huh.
20      Q.     Is that a yes?
21      A.     Yes.
22      Q.     What does that refer to?
23      A.     It's the same as a Client ID in this
24  case.  It's something that was put in later
25  just for ordering.

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

17

1                           ABRAHAM

2          Q.     What is the significance of it?

3          A.     At some point along the way, some

4    ID's were given with different letters, but the

5    same date, and it was hard to put them in

6    correct date order that way, so there was some

7    translation necessary to put them in correct

8    date order.  In this case, it translated to the

9    same thing.

10         Q.     Do you have a specific memory of you

11   ever entering any of the data into Access for

12   this particular case?

13         A.     I probably entered some of the --

14   some of the dates along the way on the later

15   pages, not the initial data.  Probably not.

16         Q.     The third column, it says, "Status"

17   and it says "T."  What does that represent?

18         A.     That means, in fact, we had sent

19   faxes for this customer and the customer had

20   paid us.

21         Q.     What does the "T" stand for?

22         A.     Just letters of the alphabet were

23   assigned, fairly much in order of the process.

24         Q.     What were some of the other letters

25   that could be included in the "Status" column?

18

1                           ABRAHAM

2          A.    Almost all of them.

3          Q.    Okay.  But "T" meant that faxes were

4     sent and the client had paid; correct?

5          A.    Correct.

6          Q.    The fourth column, it says, "Fax,"

7     and then it says, "True."  Do you see that?

8          A.    Yes.

9                THE REPORTER:  It says?

10               MR. KELLY:  "True," t-r-u-e.

11         Q.    What does that represent?

12         A.    That this client was, in fact,

13    interested in sending faxes.

14         Q.    The next column it says, "Voice,"

15    and then it says, "False."  Do you see that?

16         A.    Right.  That this client did not

17    show an -- have an interest or do business for

18    us to send voice mails for him, voice ads.

19         Q.    The next column it, says, "Ext1,"

20    then there's number, "350."  Do you know what

21    that represents?

22         A.    Yes an extension in our phone system

23    for to us receive calls for this client or to

24    transfer the calls to him.

25         Q.    So, in this particular case, when

the final advertisement was created, there was a telephone number assigned to this particular company that allowed the recipients of the faxes to call; right?

A. Correct.

Q. And there would be a unique extension given to the Finish Thompson in this case; right?

A. Correct.

Q. And is the unique extension number was 350?

A. Correct.

Q. What is the purpose of including a toll-free number that Business to Business Solutions would answer instead of putting the phone number of the particular company on the ad, so that anyone showing interest in the fax can call the company directly?

A. Largely for Macaw, themselves, to take the calls that came in the first day, which would often include complaints about the faxes.

Q. There's another column that says, "Agent 1st" and "Agent Sale," and there's a

1                     ABRAHAM

2    name "Ron."  Do you see that?

3         A.    Yes.

4         Q.    What does that represent?

5         A.    "Agent 1st" was the first agent who

6    talked to the customer.  "Agent Sale" is the

7    one who dealt with the customer later.

8    Sometimes they were the same person, sometimes

9    they were different.

10        Q.    And that's Ron Hillard; is that

11   right?

12        A.    Hillard.

13        Q.    Hillard, so it's Hillard; right?

14        A.    Correct.

15        Q.    Is the next column is "Src."  Do you

16   see that?

17        A.    Right.

18        Q.    What does that represent?

19        A.    Source, from what kind of

20   advertising or how the client the client heard

21   about us or how the client got in touch with

22   us.  I don't remember much better than that.

23        Q.    What does the "CF" designation

24   represent?

25        A.    I believe it meant the customer



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

21

1                          ABRAHAM

2    called because of a fax.  May be "C" for called

3    and "F" for fax.  I'm not sure.

4          Q.    The next column, it says, "TZ" and

5    then there's a number "1."  What does that

6    represent?

7          A.    Time zone in the United States.

8    Time zone 1 was eastern time.

9          Q.    What would time zone 2 represent?

10         A.    Central time.

11         Q.    Time zone 3?

12         A.    Mountain time.

13         Q.    Time zone 4?

14         A.    Pacific time.

15         Q.    The next columns, it says, "First

16   Name" and "Last Name."  There's a name, "David

17   Bowes," B-o-w-e-s.  What does that represent?

18         A.    The first and last name of the

19   contact at the client's company.

20         Q.    The next column says, "Secretary,"

21   there's name, "Karen," K-a-r-e-n, "Clement,"

22   C-l-e-m-e-n-t.  What does that represent?

23         A.    Again, the secretary at the client's

24   office.

25         Q.    And then "Business Name," "Finish



22

ABRAHAM

1
2  Thompson," that's the name of the business; is
3  that right?
4      A.    Correct.
5      Q.    And the last column, under
6  "Business," it says, "Solvent."  Do you see
7  that?
8      A.    Yes.
9      Q.    What does that represent?
10     A.    The type of business.
11     Q.    So, someone at Finish Thompson
12  represented that they were in the solvent
13  business?
14     A.    They sold solvent, something like
15  that.
16     Q.    The next page, the first column, it
17  says, "PR" and there's a number "2.8."  Do you
18  see that?
19     A.    Yes.
20     Q.    Do you know what that represents?
21     A.    Something to do with the pricing on
22  the original advertising.  I don't remember
23  just what the prices were.
24     Q.    The next column, "Phone 1," it says
25  "(814) 455-4478."  What number does that



23

<table>
</table>

```
 1                          ABRAHAM
 2     represent?
 3          A.     The number through which to reach
 4     Finish Thompson.
 5          Q.     And the next column, is that the
 6     number to receive Finish Thompson by fax?
 7          A.     Correct.
 8          Q.     The next column, it says, "B Date,"
 9     and there's a date of "August 29, 2005."  What
10     does that represent?
11          A.     I'm not sure exactly what all of
12     these meant.  It was something like a date that
13     we first got in touch with them, or first sent
14     them the extra information besides their
15     original advertising fax.  I'm not sure.
16          Q.     What does "C Date" represent?
17          A.     Again, something similar to that.
18          Q.     What does "E Date" represent?
19          A.     I believe it was a follow-up -- no,
20     it might have been the same -- I can't remember
21     any better.  They were all connected with the
22     same thing.  It had to do with when we
23     contacted them and when we sent them more
24     information, but, I'm sorry, I can't remember.
25          Q.     What does "J Date" represent?
```

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

ABRAHAM

1

2      A.      "J Date" was the date that we first

3   got advertising information from them with

4   which to make up an ad for them.

5      Q.      Part of your job duties and

6   responsibilities at Business to Business

7   Solutions was to help create and edit the

8   advertisement; correct?

9      A.      Correct.

10     Q.      So, you worked with Finish Thompson

11  in order to finalize an advertisement that was

12  to be faxed; correct?

13     A.      I'm not sure I worked with them.  I

14  worked on the ads and we sent -- we sent copies

15  to them for approval, and I edited corrections

16  they wanted, if there were any.

17     Q.      So, you basically took orders from

18  Finish Thompson to make sure that the ad that

19  was faxed was an ad that they approved;

20  correct?

21     A.      That's correct.

22     Q.      At any time, have you ever sent out

23  an advertisement by fax that was not first

24  previously approved by a company?

25     A.      No.

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY



25

1                          ABRAHAM

2          Q.      In this case, did Finish Thompson

3     approve the ad that was ultimately faxed?

4          A.      Yes.

5          Q.      What does "M Date" represent?

6          A.      The date an ad was finally created

7     for them and sent to them for their approval.

8          Q.      What does "N Date" represent?

9          A.      The date that they -- we got

10    approval back from them.

11         Q.      What does "P Date" stand for?

12         A.      The date that we sent them a letter

13    explaining how to pay us for our services in

14    order to send out the faxes for them.

15         Q.      What does "R Date" stand for?

16         A.      The date that we received back

17    payment or proof of coming payment, something

18    like that, in order -- in order actually to go

19    ahead and send out faxes for them.

20         Q.      What does "T Date" represent?

21         A.      The date the faxes were actually

22    sent.

23         Q.      The third page?

24         A.      Uh-huh, yes.

25         Q.      It says, "Pay," and then I think



26

1                    ABRAHAM

2      it's shortened, but it should say "Pay Number";

3      is that right?

4           A.    Correct.

5           Q.    And there's a number "49."  What

6      does that represent?

7           A.    That's simply a counter in this

8      table in the database.

9           Q.    What do you mean by that?

10          A.    Access works better if every table

11     has what's called a primary key, something that

12     helps index the table.  In this case, it's an

13     index for the table.  It's an automatically --

14     it's called an auto number.  It's a number

15     that's simply assigned upped each time, simply

16     to make the database work more smoothly.

17          Q.    Then there's another column, "Client

18     ID."  It's the same ID Number; is that right?

19          A.    As in the other table, so that the

20     two tables can be linked together.

21          Q.    There's a "Payment" column with the

22     number "$288."  What does that represent?

23          A.    That's the payment amount.

24          Q.    Did Finish Thompson pay Business to

25     Business Solutions $288?



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

27

```
 1                        ABRAHAM
 2          A.    That's correct.
 3          Q.    The next column says, "Dep Date,"
 4    with a date of "October 6, 2005."  What is
 5    that?
 6          A.    It looks like -- I believe it was
 7    the date the payment was actually deposited in
 8    Business to Business' bank account.
 9          Q.    Did next column says, "Bounced," and
10    there's a word, "False."  What does that
11    represent?
12          A.    The payment did not bounce.
13          Q.    The next column says, "N Ordered."
14    Is that number ordered?
15          A.    Yes.
16          Q.    And there's number of "13,000"; is
17    that right?
18          A.    That's right.
19          Q.    What does the "13,000" represent?
20          A.    Apparently the number of faxes
21    ordered.
22          Q.    The next column says, "Zips
23    Recorded."  Do you see that?
24          A.    Yes.
25          Q.    What does the words "False" mean?
```

28

ABRAHAM

1

2     A.    That there is no record of which zip

3  codes were used.

4     Q.    And the next column is "Club," and

5  it says, "False.  Do you see that?

6     A.    Right.

7     Q.    What does that represent?

8     A.    That the client did not join a

9  special club we had where by an early payment,

10  they received reduced rates later.

11     Q.    Did Finish Thompson supply the list

12  to which the advertisement was to be send by

13  fax?

14     A.    I don't think so.

15     Q.    Who in this case who was responsible

16  for supplying the list?

17     A.    Macaw.

18     Q.    Was it the custom and practice of

19  Macaw to call the companies on the list seeking

20  permission for it to send an advertisement by

21  fax on behalf of Finish Thompson?

22     A.    Not specifically on their behalf.

23  Some -- many fax recipients were called at

24  sometime, but not specifically before faxes

25  were sent for Finish Thompson.

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

29

1                          ABRAHAM

2          Q.     Now, the data that was entered on

3     Exhibit 1, was that data entered at or near the

4     time the work was being performed?

5          A.     Yes, I'm sure it was all entered as

6     those dates were happening, not by memory

7     later.

8          Q.     That's my question.  When you

9     produced these records for this case, this data

10    had already been in your database in October of

11    2005; correct?

12         A.     Correct.

13         Q.     And it was entered at or near that

14    time; correct?

15         A.     Well, probably day by day as the

16    different dates -- the dates were probably

17    entered as they happened.

18         Q.     Did you, when retrieving these

19    documents, modify, change or alter any of the

20    data that's on Exhibit 1?

21         A.     No.

22         Q.     So, in other words,this is the data

23    that was in place in October of 2005; correct?

24         A.     Correct.

25         Q.     If you'd take a look at Exhibit 2?

1                        ABRAHAM

2        A.    Yes.

3        Q.    Are you able to determine what this

4   particular advertisement is?

5        A.    It looks like an ad we made up for

6   Finish Thompson.  I'm not sure if it was the

7   final one or not.

8              I see two different ads here that

9   are very similar, but different.  I don't know

10  which is the final one, but it's a close to

11  final version.

12       Q.    There is language near the bottom

13  which says, "Please contribute to reputable

14  American charities dedicated to helping flood

15  victims."  Do you see that?

16       A.    Yes.

17       Q.    Why is that language put in the fax?

18       A.    Macaw put that in -- I'm not -- I

19  don't completely understand, but I think it was

20  largely to minimize complaints.

21       Q.    So, Exhibit 2, 3 and 4 are versions

22  of the advertisement that was ultimately faxed;

23  is that right?

24       A.    Right, versions of it.

25       Q.    And the way to determine what the

31

```
1                        ABRAHAM
2      final version was is to review an advertisement
3      that was actually sent; correct?
4           A.     Correct.  One thing I can tell you
5      is that the one that says "Extension XXX" --
6      that's Exhibit 4 -- was apparently the earliest
7      version before we knew for sure that this
8      client was going to go ahead and before we
9      assigned an actual extension number to the
10     client.
11          Q.     Who was responsible for assigning
12     extensions to clients?
13          A.     I think mostly I did, based on a
14     list I was given of available extensions.
15          Q.     Who owned the telephone lines that
16     were used to take in calls from companies
17     showing interest in the different businesses?
18          A.     I did.
19          Q.     When you say you did, you're
20     referring to Business to Business?
21          A.     Business to Business, yes.
22          Q.     How many different telephone lines
23     did you maintain?
24          A.     That varied over time.  At that
25     time, I don't know if it was 20 or 30.
```



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

32

1                          ABRAHAM

2          Q.    What telephone carrier did you use?

3          A.    I'm not sure if was AT&T, or

4    Verizon, or some of both.

5          Q.    Were the 20 or 30 telephone lines

6    used to sent out the advertisements by fax?

7          A.    Yes.

8          Q.    Can you explain how someone can send

9    advertisements by fax using a telephone line,

10   just a general description?

11         A.    Well, it's computer driven.

12         Q.    And how is it done?

13         A.    I don't know the technical part that

14   well, but I know that the phone lines

15   themselves connect to modems that connect to

16   the computer.  That part I know, but after

17   that --

18         Q.    So, in this case someone was not

19   putting in an advertisement on a standalone fax

20   machine, dialing the number, and doing that

21   13,000 times?

22         A.    No, no, not at all.

23         Q.    So, you're saying that you can use a

24   computer with a modem that allows you to

25   download an image, in this case an



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

33

1                          ABRAHAM

2      advertisement, take a list and have the

3      computer do the work for you, is that right, in

4      a general sense?

5           A.    Essentially.  Essentially, yes.  In

6      this case not a modem, 20 or 30 modems, one for

7      each line.

8           Q.    Take a look at Exhibit 5.

9                 Let me ask you this:  When a company

10     shows interest in a fax broadcast, there's

11     discussion about how many faxes are to be send

12     and to where the faxes are to be sent; correct?

13          A.    Yes.

14          Q.    And that's done by the salesperson;

15     is that right?

16          A.    Yes.

17          Q.    Once there's an agreement as to the

18     number and to where they are to be sent, is

19     there a price quote?

20          A.    Yes.

21          Q.    And in this case, what was the

22     agreement?

23          A.    I can only judge from these records

24     that it was $288 for approximately 13,000

25     faxes, but I can't tell better than what the

34

1                          ABRAHAM

2    records say.

3         Q.    Sure.  What was the custom and

4    practice as to how payment would be received by

5    Business to Business Solutions?

6         A.    The main custom at that time was the

7    customers either told over bank account

8    information or faxed over bank account

9    information, and Business to Business created

10   no signature required checks or so-called fax

11   checks from the client's account, pay to

12   Business to Business.

13        Q.    In this case, how was it done?

14        A.    Since I don't have a copy of a fax

15   showing a copy of a check, it was probably done

16   by phone, I would guess.

17        Q.    So, did somebody at Finish Thompson

18   call you and give bank account information, so

19   that Business to Business Solutions can take

20   out the authorized amount?

21        A.    I would guess that our salesperson

22   called them and got the information.

23        Q.    What information is needed in order

24   to take money out of a particular person's

25   account?

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

35

ABRAHAM

1    ABRAHAM

2         A.    Basically just the ABA routing

3    number and the account number.

4         Q.    And then once you have that

5    information, do you create a check that you

6    deposit in the Business to Business checking

7    account?

8         A.    That's what we used to do at that

9    time, yes.

10        Q.    Is that represented by Plaintiff's

11   Exhibit 5?

12        A.    Yes.

13        Q.    Were you the person that created the

14   check that's identified as Exhibit 5?

15        A.    Yes.

16        Q.    So, you typed in the "Pay to the

17   order of," the amount?

18        A.    No.

19        Q.    Okay.  The computer did that?

20        A.    I typed in -- the computer -- we had

21   a check printing program that already had the

22   "Pay to order of" and the basic format set up.

23   I simply typed in the name -- the specific

24   information for this check, the various

25   numbers, the various names of the companies.



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

36

ABRAHAM

1

2      Q.     And then you deposited the check

3  into your bank; is that right?

4      A.     Right.

5      Q.     And you were banking at Apple Bank;

6  is that right?

7      A.     Yes.

8      Q.     And the check cleared; correct?

9      A.     Correct.

10     Q.     Now, is it the custom and practice

11  to send out the fax broadcast before or after

12  Business to Business Solutions verifies that

13  the check had sufficient funds?

14     A.     I don't think we ever verified.  I

15  think we sent out the faxes first, we deposited

16  the check, and without verifying especially

17  beforehand.

18          MR. KELLY:  Do you have to take a

19      break?

20          THE VIDEOGRAPHER:  Yes.  Let's go

21      off the record at 10:24 a.m., please.

22          (Whereupon, an off-the-record recess

23      was held.)

24          THE VIDEOGRAPHER:  We're back on the

25      record at 10:25a.m.  You may proceed.




DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

37



1                        ABRAHAM

2    BY MR. KELLY:

3         Q.    In reviewing the documents, are you

4    able to determine how many broadcasts were

5    ordered by Finish Thompson?

6         A.    I would say one because there was

7    only one payment.

8         Q.    After this particular broadcast, did

9    you ever speak to anyone at Finish Thompson?

10        A.    I never spoke to anyone there.

11             MR. KELLY:   Those are all the

12             questions I have.

13   EXAMINATION BY



14   MR. SCHLEGEL:

15        Q.    Ms. Abraham, you did business as

16   Business to Business Solutions from 2004

17   through 2005; is that right?

18        A.    No, until -- until about 2007, 2007.

19        Q.    Until 2007.  And it was never

20   incorporated?

21        A.    Correct.

22        Q.    Did the business have any employees,

23   other than yourself?

24        A.    No.

25        Q.    Did the business have an office,

38

1                              ABRAHAM

2      other than your home?

3              A.      An office?   No.

4              Q.      You worked doing business as

5      Business to Business Solutions for those four

6      years out of your home entirely?

7              A.      Yes.

8              Q.      What was the address of that

9      facility?

10             A.      1869 East 23rd Street, Brooklyn, New

11     York 11229.

12             Q.      Is that still your place of

13     residence?

14             A.      No.

15             Q.      Where do you live now?

16             A.      1601 East 18th Street, Brooklyn, New

17     York 11230.

18             Q.      What is your current business or

19     occupation?

20             A.      I work for White Glove Placement,

21     Incorporated.

22             Q.      Is that a company that you are an

23     owner of?

24             A.      No.

25             Q.      What is the nature of it's business?

40

ABRAHAM

1

2    A.    In order to work with in particular

3  with these companies out of the country.

4    Q.    And you had connections with them?

5    A.    Yes, I had connections with them.

6    Q.    Would you tell us generally what the

7  nature of those connections were?

8    A.    I had spent a fair amount of

9  sometime in Romania before that in other

10  connections.

11    Q.    During what years?

12    A.    1999 through about 2003.

13    Q.    Where were you born and raised?

14    A.    I was born in Cedar Rapids, Iowa.  I

15  was raised mostly in Los Angeles, California.

16    Q.    How did it arise that you began to

17  do business with Romanian people?

18    A.    Kind of a long story.  I was living

19  in Israel at the time and I took a vacation in

20  Romania.

21    Q.    You took a what, vacation?

22    A.    Vacation in Romania.

23    Q.    During what years did you live in

24  Israel?

25    A.    1989 until 2002.



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

41

```
 1                        ABRAHAM
 2         Q.    In 2002, did you move back here to
 3    Brooklyn?
 4         A.    I moved here to Brooklyn, yes.
 5         Q.    Here to Brooklyn.  That was the
 6    first time you lived in Brooklyn?
 7         A.    Yes.
 8         Q.    Who compiled the list as to which of
 9    these to which these fax advertisements were
10    sent?
11         A.    Macaw.
12         Q.    Do you know how they did that?
13         A.    They had a computer program, and
14    they had lists of names that they were able
15    to -- they were able to do a lot of things.
16    The would specific types of businesses, sizes
17    of businesses, geographic areas, different
18    ways.
19         Q.    What are the names of the
20    individuals at Macaw that you dealt with?
21         A.    Ron Hillard, Ionut Morar --
22         Q.    I'm sorry, Ionut?
23         A.    That's I-o-n-u-t.
24         Q.    Last name?
25         A.    Morar, M-o-r-a-r.
```



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

42

```
 1                        ABRAHAM
 2              Cristina --
 3        Q.    With a C-h or a K?
 4        A.    Right.  I think with just a C
 5   actually in Romanian.
 6        Q.    C-r-i-s-t-i-n-a?
 7        A.    -- t-i-n-a. Chirila, I believe.
 8   C-h-i-r-i-l-a, I think.
 9              Octavia Manea.  That's -- the last
10   name is M-a-n-e-a.
11              Adrian something.  I can't remember
12   his last name.
13        Q.    Adrian?
14        A.    Adrian, A-d-r-i-a-n.
15        Q.    That's a male?
16        A.    Yes, that's a male.
17        Q.    But we don't know the last name?
18        A.    No, I'm sorry.  It's probably in the
19   data base.  No, actually probably not, because
20   it's not a agent.
21              Kevin Wilson.
22              And a couple of other salesman.  I
23   don't know if you want anyone I can think of.
24        Q.    Every one that you can think of that
25   were associated with Macaw.
```

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

45

1                          ABRAHAM

2          A.    I don't know if he was or not.

3          Q.    Who do you believe was a principal

4    player at Macaw or owner?  Who was the boss?

5          A.    There was -- I think it might

6    technically have been somebody named Dragos

7    Vlasceanu.  I'm not sure.

8          Q.    Would you spell that as best you

9    could?

10         A.    D-r-a-g-o-s V-l-a-s-c-e-a-n-u.  I

11   believe they said that he was the owner.  I'm

12   not sure.

13         Q.    Had you met these folks in your

14   travels to Romania when you were living in

15   Israel?

16         A.    Yes.

17         Q.    Did you determine at that time that

18   you were going to do business out of Brooklyn

19   with them?

20         A.    No.

21         Q.    How did it come that you decided to

22   set up shop, so to speak, in Brooklyn and do

23   business with them beginning in '03 or '04?

24         A.    Well, set up shop or do business?

25         Q.    Well --



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

48

1                          ABRAHAM

2          Q.    When was the last time that you did?

3          A.    Summer of last year.

4          Q.    What was the nature of the business

5     that did you with them last?

6          A.    The same thing, faxing.

7          Q.    Fax advertisements?

8          A.    Fax advertisement or voice dialing

9     advertisement.

10         Q.    Do you have records concerning the

11    phone lines, 20 or 30, that you maintained back

12    at the time that these faxes were allegedly

13    sent?

14         A.    I don't know.  I'd have to search

15    through old phone lines and figure it out.

16         Q.    Did you get the bills --

17              MR. KELLY:  Hold on.

18         A.    I did get the bills.

19              MR. KELLY:  I don't know if she was

20              done answering the last question.

21              MR. SCHLEGEL:  Okay.

22         A.    I don't know.  I'd have to search my

23    records.  I did get the bills, but at sometimes

24    over the years the bills came electronically,

25    so I didn't always print them out.  So, I don't

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

49

ABRAHAM

1
2  know which I still have records from and which
3  I don't.
4          MR. SCHLEGEL:  Do you want to take a
5          five-minute break?  Fine.
6          THE VIDEOGRAPHER:  Going off record
7          at 10:42 a.m.  End of Tape 1.
8          (Whereupon, an off-the-record recess
9          was held.)
10         THE VIDEOGRAPHER:  We're back on
11         record at 10:53 a.m.  You may proceed.
12 BY MR. SCHLEGEL:
13     Q.    Ms. Abraham, I had asked you who was
14 associated with Macaw, this Romanian company
15 with whom you did business.
16     A.    Uh-huh.
17     Q.    And you had given us a series of
18 names.
19     A.    Uh-huh, yes.  Sorry.
20     Q.    Mr. Hillard was one of those folks.
21 Do you know what his position or function was
22 with Macaw?
23     A.    A sales agent for one.
24     Q.    Where did he reside?
25     A.    Sometimes in Bucharest, sometimes in

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

50

1              ABRAHAM

2    New York and sometimes, I think, in other parts

3    of the country.

4         Q.    He came to your place of residence,

5    which was your place of business?

6         A.    Yes.

7         Q.    And dealt with you in terms of

8    setting up these phone lines?

9         A.    Yes.

10        Q.    And the computer system that you

11   used?

12        A.    Yes.

13        Q.    Did anyone else come with him to

14   help you in that set-up process from Macaw?

15        A.    In the set-up process, no.

16        Q.    He was the sole person that --

17        A.    From Macaw.

18        Q.    -- dealt with you from Macaw?

19        A.    Uh-huh.

20             MR. KELLY:  Is that a yes?

21             THE WITNESS:  Yes.

22        A.    I'm sorry, yes.

23        Q.    Was he the only person from Macaw

24   who actually came to the United States in your

25   dealings with them?



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

51

1                           ABRAHAM

2          A.    No.  Octavia Manea also came.

3          Q.    Is Mr. Hillard a United States

4     resident, as far as you know now?

5          A.    Yes, I believe.

6          Q.    Where does he live?

7          A.    In New York.

8          Q.    What does he do; do you know?

9          A.    I can't say.

10         Q.    When is the last time you had any

11    contact with him?

12         A.    Recently.

13         Q.    You are friendly with him?

14         A.    Yes.

15         Q.    In a business sense?

16         A.    (Witness nodding.)

17               MR. KELLY:  Is that a yes?

18               THE WITNESS:  Yes.

19         Q.    Is he doing anything in connection

20    with your business now of this White Glove,

21    Inc.?

22         A.    No.

23         Q.    What is the nature of his business

24    or occupation as you know it now?

25         A.    A salesman, I guess.

53

1                        ABRAHAM

2     company?

3          A.    I think another one was named

4     Hyacinth.

5          Q.    What was the nature of that

6     company's business; do you know?

7          A.    I think it was doing a lot of

8     different things in Romania.  I don't know

9     specifically.  They were doing a lot of

10    different things in Romania.  I don't remember

11    specifically what.

12         Q.    Is Hillard a Romanian citizen?

13         A.    No.

14         Q.    He is a U.S. citizen, as far as you

15    know?

16         A.    Yes, as far as I know.

17         Q.    Do you know where he was born and

18    raised?

19         A.    Actually, where he was born -- I

20    think he was raised around Boston.

21         Q.    How old is he?

22         A.    In his sixties.

23         Q.    Where does he live now?

24         A.    In New York.

25         Q.    Where?

55

1                         ABRAHAM
2          A.    Yes.
3          Q.    You knew where he lived then?
4          A.    Probably.
5          Q.    And you know where he lives now?
6          A.    Yes.
7          Q.    But you're unwilling to answer my
8    question as to where that is?
9                MR. KELLY:  Objection, asked and
10         answered.
11         A.    That's right.
12         Q.    Why is that?  Why are you unwilling
13   to give us that information?
14         A.    I -- I don't think that that
15   would -- I don't think he would like that.  I
16   would have to check with him.
17         Q.    Now, you understand that you're
18   under oath in a proceeding in the United States
19   District Court for the --
20         A.    Yes, I do.
21         Q.    -- Eastern District of -- Northern
22   District of Illinois, Eastern Division, do you
23   not?
24         A.    Yes, I do.
25         Q.    And you've affirmed that you would



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

56

                              ABRAHAM
1
2      tell the truth?

3           A.    Yes.

4           Q.    And if I were to ask you again where

5      Mr. Hillard lives, you would refuse to answer

6      that question; correct?

7           A.    Until I'd have to chance to speak to

8      him, yes.

9           Q.    Will you tell me what his phone

10     number is?

11          A.    Again, no, I can't do that now.

12          Q.    Do you know what it is?

13          A.    Yes.

14          Q.    You could call him?

15          A.    I could.

16          Q.    I'm going to give you a cell phone

17     and ask you to call him and tell him that I'm

18     inquiring as to where he lives.  Would you

19     please do that?

20          A.    I'd rather not do it on yours and

21     show his number.

22          Q.    Well, I'm the attorney asking the

23     question, ma'am, and I'm asking you to do that;

24     all right?  Dial his number on my cell phone?

25          A.    Not on your cell phone, no.



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

57

1          ABRAHAM

2          MR. KELLY:  There's another way we

3    could do it.

4    Q.    Will you tell us what his number is?

5    A.    No.

6          MR. KELLY:  Counselor, if there's

7    another way to get the number, why don't

8    we?

9          MR. SCHLEGEL:  The easy way to get

10   the number is to have the witness tell the

11   truth and tell us what the phone number,

12   and it's absolutely ridiculous that

13   there's a refusal to answer this question.

14         MR. KELLY:  Counselor, if we want to

15   take a short break and come up with a way

16   in which we can get the address and phone

17   number, we can do that.

18         MR. SCHLEGEL:  I'll go off the

19   record, if you wish, and explore that with

20   you off the record.

21         THE VIDEOGRAPHER:  All parties want

22   to go off record at this time?

23         MR. KELLY:  Yes.

24         MR. SCHLEGEL:  Yes.

25         THE VIDEOGRAPHER:  Going off record



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

58

```
 1                      ABRAHAM
 2         at 11:03 a.m.
 3                  (Whereupon, an off-the-record
 4         discussion was held.)
 5                  THE VIDEOGRAPHER:  We are back on
 6         record at 11:27 a.m.  You pay proceed.
 7    BY MR. SCHLEGEL:
 8         Q.    Ms. Abraham, did you call
 9    Mr. Hillard?
10         A.    Yes, I finally got through and he
11    let's me give out his number.
12         Q.    Pardon me?
13         A.    He let's me give out his number.
14                He also reminded me -- I didn't -- I
15    had forgotten this -- that he's actually moved
16    to Massachusetts, back to Massachusetts,
17    although he's in New York a lot.
18         Q.    What is his telephone number that
19    you called?
20         A.    It's (334) 375-7699.
21         Q.    And you say he currently lives in
22    Massachusetts?
23         A.    Yes.
24         Q.    In what city or 'burb?
25         A.    It's a small town.  He told me once.
```

59

                              ABRAHAM

1

2    I'm sorry, I think it's somewhere in the

3    greater Boston area.

4         Q.    Do you know if Macaw is still in

5    business?

6         A.    I believe it's not, but I'm not a

7    hundred percent sure.

8         Q.    Upon what do you base that believe?

9         A.    Well, I think -- I think Ron Hillard

10   has told me.  I haven't -- I haven't had any

11   dealings with them myself.

12        Q.    Do you do business with Hillard

13   currently?

14        A.    No.

15        Q.    Had you done business with him in

16   any sense other than this blast fax business

17   that we're talking about in this case?

18        A.    I think -- I think some advertising

19   a long -- years ago back when I was in Israel

20   also.

21        Q.    Are you aware of the fact that the

22   Federal Government has enjoined you from being

23   involved in this so-called junk fax business?

24        A.    I understand that there are various

25   laws about -- about faxing, depending on

60

1                    ABRAHAM

2   whether we have a business relationship with

3   customers, that sort of thing.

4        Q.    Do you know that the Federal

5   Government has actually enjoined you from

6   engaging in this business?

7        A.    I don't know.  Have they?  I don't

8   know.

9        Q.    You don't know?

10       A.    No, I don't know.

11       Q.    Are you aware of being under

12  investigation federally for any other business

13  dealings that you have had --

14            MR. KELLY:  Objection, relevance.

15       Q.    -- presently?

16       A.    No.  No.

17       Q.    Had you engaged in the business of

18  offering university degrees through the

19  internet?

20            MR. KELLY:  Objection, relevance.

21            MR. SCHLEGEL:  Okay, subject to the

22       objection.

23       Q.    Had that been part of your business

24  in the last few years?

25       A.    No.



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

61

1                          ABRAHAM

2        Q.    When did you first become employed

3    by White Glove Placement, Inc.?

4               MR. KELLY:  Objection, asked and

5          answered.

6               You can answer.

7        A.    A year ago.

8        Q.    A year ago?

9               Do you go to an office for that

10   company.

11       A.    Yes.

12       Q.    Where is that office located?

13       A.    85 Bartlett Street, Brooklyn, New

14   York 11206.

15       Q.    That's pretty nearby where we are

16   today, is it not?

17       A.    I don't know as the crow flies --

18       Q.    How far away is it?

19       A.    -- but I know it's -- it's going to

20   be two subways away, two trains away for me to

21   get there.

22       Q.    Can you tell me the phone numbers of

23   the lines that you used in connection with this

24   Business to Business fax?

25       A.    There were many of them.  I don't

62

1                       ABRAHAM

2       remember them.  I have old phone bills.  Maybe

3       I could dig them up.

4            Q.    All right.  May I ask that you

5       consider yourself served.

6                  You were served with a subpoena to

7       come in here today --

8            A.    Yes.

9            Q.    -- for your deposition?

10           A.    Oh, not specifically today, but at

11      one point.

12           Q.    And you have been served with a

13      subpoena to produce documents, records of your

14      business, as they pertain to this?

15           A.    Correct.

16           Q.    You have not previously produced

17      telephone records have you?

18           A.    Correct.

19           Q.    How long would it take you to get us

20      copies of any phone records that you have?

21           A.    I don't know, I don't know how

22      complicated that would be.  I don't know if I

23      even can.  I don't -- I don't know which phone

24      companies we used at the time.  I could see

25      what my records are, but --

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY



63

```
 1                         ABRAHAM

 2         Q.     If I asked you what phone company

 3    you used to have these faxes sent out in August

 4    of '05 --

 5         A.     Uh-huh.

 6         Q.     -- or October '05 --

 7         A.     Uh-huh.

 8         Q.     -- what would your answer be?  What

 9    phone companies did you use?

10         A.     I'd have to look through bank

11    records, my file cabinet.  I don't know what

12    I'll find.

13         Q.     You have no recollection as to what

14    companies they were?

15         A.     At different times over the years we

16    used mostly AT&T and Verizon, sometimes also

17    Vonage, for short a time also Packet 8.

18         Q.     How do I find out what lines sent

19    out this fax to what numbers?

20         A.     I'd have to start with looking at

21    my -- who I paid -- whom I paid at that time

22    for phone lines, what old bills I have, what I

23    can dig up from the internet or from writing

24    letters.

25         Q.     Okay.
```

64

```
 1                    ABRAHAM
 2        A.    And it's still going to be a guess
 3   because I don't know exactly what time the
 4   faxes went out.  We know pretty well the date
 5   from this, but other things were sent that date
 6   also.
 7        Q.    All right.  Let's go back to this
 8   date.  You're saying that these faxes would
 9   likely have been sent out on October 5th --
10   October 6, '05?
11        A.    Right, October 5th or 6th, I
12   believe, or some of both.
13        Q.    The R date on the exhibit is the 5th
14   of October?
15        A.    Yes.
16        Q.    And the T date is the 6th of
17   October?
18        A.    Correct.
19        Q.    Is there any way of determining
20   whether it was the 5th or the 6th that these
21   specifically were sent out?
22        A.    I guess that they were started on
23   the 5th, it might have been the 6th, or even if
24   they were started on the 5th, it takes a long
25   time.  They might have finished on the 6th.
```



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

65

                              ABRAHAM
1
2        That's the best I can tell.
3             Q.    Now, the physical process of doing
4        that, back on the 5th and 6th of October, how
5        did that take place?
6                   Let's assume that I'm Ron Hillard or
7        Macaw and you're Business to Business
8        Solutions.  You say, "I got my check in.  Okay,
9        send the faxes."  Who does what to send faxes
10       at that time?
11            A.    Those two other -- the two other
12       male employees, Ionut and Adrian.
13            Q.    Okay.  Those guys --
14            A.    One of them would actually take the
15       ad and turn it into the form that was -- into
16       the -- they save it as, I think, a tif or
17       something, some different kind of format.
18            Q.    On the computer?
19            A.    Right.
20            Q.    And they're operating the computer?
21            A.    Right.
22            Q.    In Romania?
23            A.    Out of Romania, but --
24            Q.    Out of Romania?
25            A.    Out of Romania because I think it



         DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

67



```
 1                          ABRAHAM
 2      messenger.
 3              Q.      Which is a computer call?
 4              A.      Uh-huh.
 5                      MR. KELLY:   Is that yes?
 6              A.      Yes.
 7              Q.      Like a text message on a telephone
 8      line?
 9              A.      Well, no, no.  It's over computer.
10      It's for chatting back and forth by computer.
11              Q.      So, you're the one that gives them
12      the go?
13              A.      Yes.
14              Q.      And they then push the buttons to
15      send the faxes?
16              A.      Yes.
17              Q.      And as far as you know, that's what
18      was done in this case?
19              A.      As far as I know, yes.
20              Q.      How many other clients did you
21      process these faxes for?  I mean, how many
22      other Finish Thompsons are in out there over
23      the course of '05, '06 and '07?
24              A.      A few hundred.
25              Q.      A few hundred?
```

68

                                    ABRAHAM
1

2          A.     I think so.

3          Q.     There are 250 business days in every

4    year?

5          A.     Uh-huh, yes.

6          Q.     So, you're sending out faxes, or

7    Macaw is sending outs faxes with your help and

8    your phone lines?

9          A.     Yes.

10         Q.     A few hundred times over the course

11   of three or four years?

12         A.     Correct.

13         Q.     So, you've got one going every other

14   day or every three days?

15         A.     It varied.

16         Q.     When things were going along, on

17   average, it would be about every two to three

18   days you'd send out a mass of fax

19   advertisements; right?

20         A.     The sometime varied.  Sometimes more

21   than one a day, sometimes less.

22         Q.     Okay.  Now, you mentioned on your

23   direct examination here that you put this,

24   "Please contribute to reputable American

25   charities" clause largely to eliminate

69

1              ABRAHAM

2    complaints that were received at the time that

3    the faxes were sent out; is that right?

4         A.    Right.

5         Q.    When the faxes were sent out and

6    people complained, who did they complain to?

7    Did they call you or did they call --

8         A.    They called usually the phone number

9    of the company in the ad.

10        Q.    That's the "For details," or they

11   called Finish Thompson, their phone number at

12   the top of the ad?

13        A.    Well, they also have their phone

14   number on the top.  It could be either one.  Or

15   our own phone number, Macaw's number's at the

16   bottom sometimes also.  Any of them.

17        Q.    This number (718) 645-218, Extension

18   233, was that a phone line that you maintained?

19        A.    Yes.

20        Q.    In the name of Business to Business

21   Solutions or in the name of Caroline Abraham?

22        A.    I don't remember.

23        Q.    Is the other 718 number, 645-2021 --

24   is that the same type of number, the same

25   number that you maintained?

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

70

1                          ABRAHAM

2          A.     I believe they were part of the same

3     set that I also maintained.  I believe these --

4          Q.     You say you had 20 to 30 such

5     numbers?

6          A.     Usually.  I'm not sure at that time.

7     It could have been 10 or 20 or 30.  They were

8     usually in sets.  I believe this was a Verizon

9     number.

10          Q.     When you paid your phone bill back

11     in October of '05, when this fax was sent --

12          A.     Yes.

13          Q.     -- did you write a check, put it in

14     the mail?

15          A.     I might have or I might have paid

16     over the internet.  I don't remember.

17          Q.     Can you determine when you go back

18     and check your records?

19          A.     That I can find out.

20          Q.     Can you find the numbers that you

21     were using in October of '0 --

22          A.     '05?

23          Q.     -- 5 by finding the payment of the

24     bill, whether on-line or by check, that you

25     received after the time that these faxes were


DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

71

1                          ABRAHAM

2    sent out?

3          A.    It's very likely.

4          Q.    Okay.  Now, how much time would it

5    take you to do that and to send to counsel and

6    I copies of those records?

7          A.    It depends on whether I have the

8    records or not, or whether I have to start

9    calling, or writing, or e-mailing or something

10   the phone companies.

11         Q.    Okay.

12         A.    It might -- you know, it might be

13   fast, half an hour, or it might take hours, or

14   days or weeks waiting for correspondence.  I

15   don't know.

16         Q.    Okay.  Well, I'm going to ask that

17   you do that process, and that you give Attorney

18   Kelly and I a call to report just what that

19   process is going to be.  I mean, you can call

20   us and tell us you either do or do not have the

21   records and --

22              MR. KELLY:  Or if you have any

23         questions.

24         Q.    We're going to have to resume this

25   deposition to review that process with you,





72

ABRAHAM

1
2      okay, unless we have a great deal of
3      cooperation and communication that we're agreed
4      upon and that you've got to us what you can get
5      us to answer these questions; okay?
6               Specifically, I want to find out
7      what lines sent out this fax to whom; all
8      right?  And whatever that process entails is
9      what we have to find out in this case; okay?
10         A.   Okay.
11         Q.   And it's not a matter of criticism
12     of you, or criticism of Mr. Hillard or anybody
13     involved in the thing.  It's just what we've
14     got to find out to resolve this litigation in
15     Chicago; okay?
16         A.   I understand.
17         Q.   If we can find it out, great.  If we
18     can't find it out, we've got to know why we
19     can't find it out; okay?
20         A.   Okay.
21         Q.   Fair enough.  Do you currently own
22     any business that's involved in faxing
23     advertisements?
24         A.   No.
25         Q.   And you have been out of that



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

73

1                              ABRAHAM

2      business for the last year or more?

3            A.    Yes.

4            Q.    Is your husband involved in a

5      similar business?

6            A.    No.

7            Q.    Was he involved with you at that

8      time back in '05, 6 and 7 in this business,

9      Business to Business Solutions?

10           A.    Helping me, personally, but not

11     doing the business.

12           Q.    What is his business or occupation?

13           A.    It's a company called Instant

14     Response Systems.

15           Q.    What is the nature of that business?

16           A.    Medical alert systems.

17           Q.    That's like the phone things around

18     the person's neck?

19           A.    Yeah -- yes.

20           Q.    For alarms for elderly people who

21     may need to -- fall or may suffer a fall or

22     needy emergency care?

23           A.    Yes.

24           Q.    And his business is involved in

25     marketing such systems, is it?

```
 1                      ABRAHAM
 2         A.    Yes.
 3         Q.    He doesn't manufacture the systems?
 4         A.    No.
 5         Q.    Does he run that out of your home?
 6         A.    Yes.
 7         Q.    Does he use the same computers that
 8    you used back in '05 and '06 in connection with
 9    these businesses?
10         A.    He has a different one, but I
11    sometimes help him out with my computer, which
12    I use for everything.
13         Q.    I see.  How do we identify your
14    computer?  Back in '06 you were using what type
15    of machine?
16         A.    A Dell something.
17               MR. KELLY:    '06 or '05.
18               MR. SCHLEGEL:  '06 -- I'm sorry,
19         '05.
20         A.    A Dell something.  I don't know what
21    it's called.
22         Q.    A Dell something and it's a Windows
23    operating system?
24         A.    Yes.
25         Q.    And it communicated with the system
```

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

1                              ABRAHAM

2      that Macaw had in Romania?

3           A.     Well, yes.

4           Q.     To other computers?

5           A.     Yes, with the internet.

6           Q.     But Macaw, they owned their own

7      computers?  This wasn't part of your business;

8      right?

9           A.     That's correct.

10          Q.     And the numbers that were called to

11     send these faxes, were they kept on your

12     computer or were they kept on Macaw's

13     computers?

14          A.     I'm not sure if they physically

15     resided in Macaw's computers or in one of the

16     computers that -- not my own, but one of the

17     others that I had that connected to the phone

18     lines.

19          Q.     What are these others that you had?

20     How do we identify them?

21                 You had other computers hooked up

22     with modems?

23          A.     Right, one for each set of modems.

24          Q.     How many modems did you have?

25          A.     One per phone line, depending on how

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

76

1                        ABRAHAM

2       many phone lines there were at the time.

3            Q.    So, you had between 20 and 30 phone

4       lines, and 20 and 30 modems and 20 to 30

5       computers?

6            A.    No, no.  One computer could do a

7       number of phone lines.  I'm not sure if one did

8       all 30, or one did 20 at a time.  I'm not sure

9       what the set-up was.  There might have been a

10      limit.

11           Q.    Did you have a computer consultant

12      that came in to set up your systems?

13           A.    When I first moved to New York, a

14      computer consultant helped me a little.  After

15      that, my son is very good at computers and he

16      did most of my help.

17           Q.    And this is your son Joshua?

18           A.    Joel.

19           Q.    Joel.  Does he still live with you?

20           A.    Yes.

21           Q.    I meant to ask you early on,

22      Ms. Abraham, what was the nature and extent of

23      your formal education?  How far did you get in

24      school?

25           A.    A Ph.D.



1                    ABRAHAM

2       Q.    From where, in what?

3       A.    From UCLA in mathematics.

4       Q.    What year did you get your Ph.D.?

5       A.    1979.

6       Q.    From where was your undergraduate

7    degree?

8       A.    UC Berkeley.

9       Q.    In what year?

10      A.    1970.

11      Q.    What was the degree?

12      A.    In mathematic, bachelor of arts.

13      Q.    B.A.?

14      A.    B.A.   I think they actually called

15   it an A.B., but the same thing.

16      Q.    And you got your master's from

17   where?

18      A.    From UCLA, but just as a side thing

19   in the Ph.D. program.

20      Q.    Did you teach out there for a period

21   of time during your qualification years for a

22   Ph.D.?

23      A.    No.   I worked as a teaching

24   assistant one quarter only, but that wasn't

25   real -- you wouldn't call that a teacher.



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

1                          ABRAHAM

2          Q.    Well, obviously you're a very bright

3     person and -- what was your thesis?

4                    MR. KELLY:  Objection, relevance.

5                    Go ahead.

6                    MR. SCHLEGEL:  I need to know some

7               background on this person here.

8          Q.    What was the title of your theses?

9     You've got to remember that.

10         A.    No, I don't remember the title

11    exactly.

12         Q.    No.  What's the nature of the --

13         A.    It was in universal algebra.

14         Q.    Universal algebra.

15         A.    And -- and it was something like,

16    "Infinitely Based Finite Algebras Derived from

17    Latices."

18                    MR. KELLY:  You asked.

19                    MR. SCHLEGEL:  And I'm right with

20               it.

21         Q.    "Infinitely" --

22         A.    -- "Based Finite Algebras" --

23         Q.    -- "Based Finite Algebras" --

24         A.    -- "Derived from Latices."

25         Q.    -- "Derived from Latices."

79

1                    ABRAHAM

2          A.    But I'm not sure that -- I mean, it

3    was those -- those things were ingredients of

4    the title, but I'm not sure if that's the exact

5    order.

6          Q.    Okay, very good.  To your

7    recollection, you had between 20 and 30 phone

8    lines that you maintained so that Macaw could

9    send out these faxes --

10         A.    Correct.

11         Q.    -- back in '05; right?

12         A.    Correct.

13         Q.    You'll have to go to your records to

14   find out whether it's 20 or 30, or 22 or 25?

15         A.    Or 10, or 18, or --

16         Q.    Okay.  And you are agreed that as

17   part of your responsibilities in this subpoena

18   in this proceeding that you will go home and

19   take reasonable steps to find out what records

20   you have and to reveal them to both Mr. Kelly

21   and to my office?

22         A.    Yes, reasonable, yes, but I'm not

23   going to go right home from here.

24         Q.    No, no, no, I'm talking about --

25         A.    When I'm at home.

80

1                          ABRAHAM

2          Q.     -- when you're home and you have

3     some time --

4          A.     When I have time, yes.

5          Q.     -- within the next couple of

6     weeks --

7          A.     Okay.

8          Q.     -- something like that, a reasonable

9     time.

10         A.     Okay.

11         Q.     That you are under the requirement

12    of our request in this process through this

13    subpoena --

14         A.     I understand.

15         Q.     -- to search for what records you

16    have, and be able to tell us what you got, and

17    what you're going to have to get or how we're

18    going to have to get it; okay?

19         A.     Correct.

20         Q.     What is the phone number I may reach

21    you at?

22         A.     If I got you the lines, you'd be

23    able to get the records yourselves, or do I

24    have to go that far?  How far do I have to go?

25              MR. KELLY:  What we can do is --

81

1                          ABRAHAM

2          Q.    We can subpoena the phone companies

3    if you can tell us --

4          A.    If I can identify --

5          Q.    If you can identify the lines that

6    sent out these faxes.

7          A.    Then you could do the rest?

8          Q.    Well --

9          MR. KELLY:  We can provide an

10         authorization that will allow the phone

11         carrier to release the records to you,

12         because you maintained those lines, and

13         you could then, in turn, give the

14         telephone records to us without us

15         necessarily subpoenaing the phone company.

16              We can provide you with that written

17         authorization language, which you would

18         just need to sign.  I can provide that to

19         you.

20              But what we do need is the telephone

21         numbers and the carrier to which those

22         telephone numbers were assigned to before

23         we can do anything, and you should be able

24         to get that from the billing records.

25         Q.    Okay?



82

1                          ABRAHAM

2        A.     Okay.  I mean, I hope so.

3        Q.     So, you'll tell us what you can find

4    from your records and then we'll go from there;

5    okay?

6        A.     Yes.

7             MR. SCHLEGEL:  I don't have anything

8             further at this point in time.

9             I note that subject to your response

10            in a reasonable time to this record

11            request that I reserve the right to call

12            you back in here to conclude this session,

13            but that may not be necessary if we get

14            the records.

15            MR. KELLY:  I have just a few

16            follow-up questions.

17            MR. SCHLEGEL:  Sure.

18   FURTHER EXAMINATION

19   BY MR. KELLY:

20       Q.     Ms. Abraham --

21       A.     Yes.

22       Q.     -- you had said that Ron Hillard was

23   the person responsible for creating the lists

24   for the advertisements to be sent by fax?

25       A.     No, I didn't say that.


DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

1                          ABRAHAM

2          Q.     Who's responsible at Macaw for doing

3     that.  I don't know which one of them is.  He

4     worked -- he and Ionut and Adrian.

5          Q.     So, it would be those three people

6     that would be responsible for obtaining the

7     company information for each particular

8     broadcast?

9          A.     Yes.

10         Q.     Okay.  And in --

11         A.     Mainly Ionut and Adrian.

12         Q.     Do you have knowledge as to how or

13    what search criteria was generally used in the

14    fax broadcasts?

15         A.     It depends on the kind of business.

16         Q.     Can you explain that?

17         A.     All right.  For instance,

18    restaurants advertised to the people closest to

19    them.

20         Q.     So, would it be fair to say that a

21    search criteria would be a certain mile radius

22    from the restaurant location?

23         A.     That would be fair to say for a

24    restaurant.

25         Q.     In this case, since the defendant is

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

84

1                              ABRAHAM

2      Finish Thompson and they've been identified as

3      a solvent company, it appears that they were

4      selling --

5           A.    Well, let me say, I don't know what

6      kind of company they were, but the thing they

7      wanted to sell was solvent.

8           Q.    Okay.  Do you have a belief as to

9      how the list was created in order to send out

10     the faxes?

11          A.    I would -- I would guess that they

12     told us what types of companies tended to buy

13     solvent from them.

14          Q.    Is there a way to --

15               MR. SCHLEGEL:  I just want to note

16          an objection for the record both as to the

17          foundation -- the question not having any

18          foundation and the answer being a guess.

19          It stands for what it is.

20          Q.    How did Macaw obtain company

21     information?  Did they buy it from a third

22     party?

23          A.    They had the lists for a long time,

24     but I believe they bought them originally from

25     one of the list providers.

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

1               ABRAHAM

2          Q.     Some of the most common list

3     providers are Info USA or Dun & Bradstreet.  Do

4     any of those names ring a bell?

5          A.     Maybe -- maybe Info USA.

6          Q.     Do you have an understanding that if

7     you purchased a national database of company

8     information from Info USA you can search by SIC

9     code?

10         A.     I don't know how they worked, but I

11    know that we did that.

12         Q.     What do you mean you did that?

13         A.     That the Macaw guys, they would work

14    from SIC codes.

15         Q.     What is an SIC code?

16         A.     Some sort of code of different types

17    of businesses.

18         Q.     Are those codes registered with the

19    Federal Government?

20         A.     I have no idea where they come from.

21         Q.     Who would have the most knowledge at

22    Macaw with respect to how it obtained company

23    information to fax advertisements for Finish

24    Thompson?

25         A.     I don't know which of the guys.


DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

1                           ABRAHAM

2                    What they did originally for Finish

3    Thompson?

4          Q.    Right.

5          A.    I don't know if any of them would

6    remember at this point.  It was -- I mean, I'm

7    pretty sure that it must have been Ionut or

8    Adrian who did it, but -- if they can think

9    back that many years.

10         Q.    Are you in contact with those two

11   people?

12         A.    No.

13         Q.    Do you know their phone numbers?

14         A.    No.  I might be able to get them

15   from someone, but --

16         Q.    Is Ron Hillard in contact with those

17   two people?

18         A.    I don't know.

19         Q.    Is there a way to determine after a

20   fax broadcast occurred what list was used for

21   the particular broadcast?

22         A.    I think they had records.  I think

23   they had actual lists of which phone numbers

24   were sent to, which actually got through and

25   which didn't.



87



1                         ABRAHAM

2          Q.     Did you search for that for those

3     sometimes of documents in this case?

4          A.     Yes, but I had no record of it on my

5     own.

6          Q.     Did you ask Ron Hillard whether he

7     has that information?

8          A.     No.

9          Q.     When you made your phone call to

10    Mr. Hillard today, did you ask him if he had

11    either transmission reports, call detail

12    records or lists from any of the broadcasts for

13    the fax broadcasting?

14         A.     No.

15         Q.     Did Ron Hillard ever create lists

16    for companies such as Finish Thompson to do a

17    fax broadcast?

18         A.     I don't think he did it.  I think

19    Adrian and Ionut did it.

20         Q.     Who requested those two people to

21    create the lists?  Was it you, or Ron Hillard,

22    or any other sales agent?

23         A.     Well, yeah, it -- right it could

24    have been one of the sales agents.

25         Q.     And then how would those two people

88

ABRAHAM

1    
2    transfer the company information to the person
3    who would send out the faxes, or would they
4    just do it themselves?
5         A.    Well, the people who created the
6    lists were the same people who sent out the
7    faxes, those two, Ionut and Adrian.
8         Q.    Are Ionut and Adrian still in the
9    United States?
10        A.    As far as I know, they're still in
11   Romania.
12        Q.    When is the last time you spoke to
13   Ionut?
14        A.    At least over a year ago.  I don't
15   know.
16        Q.    How about Adrian?
17        A.    The same thing, over a year ago.
18        Q.    After a particular broadcast was
19   sent, is there some type of summary report
20   that's automatically created?
21        A.    Yes.
22        Q.    What would you call that report?
23   Would you call it a summary report or what
24   would you call it?
25        A.    Well, we've seen other examples that

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

89

1                           ABRAHAM

2        are called transmission reports.

3             Q.    Do those transmission reports show

4        who was sent the fax?

5             A.    No.

6             Q.    Do the transmission reports show the

7        total number of successful transmissions?

8             A.    Yes.

9             Q.    In this case, were you able to find

10       the transmission report?

11            A.    No.

12            Q.    Is there any way if you did further

13       investigation to find that type of transmission

14       report?

15            A.    I'm sorry, what's the question?

16            Q.    If you did further investigation,

17       either called Ron Hillard or contacted the

18       people from Macaw, would there be a way that

19       you could obtain that type of transmission

20       report?

21            A.    I don't know.  It might me possible,

22       but I don't know.

23            Q.    Who would you call to obtain that

24       information?

25            A.    Try to get in touch with any of

1                         ABRAHAM

2    them.

3         Q.    Well, have you done that in this

4    case?

5         A.    I asked around a little bit.  I

6    didn't -- I didn't really get anywhere.

7         Q.    Who did you ask?

8         A.    People -- people -- other people.

9              MR. KELLY:  That's all I have.

10   FURTHER EXAMINATION

11   BY MR. SCHLEGEL:

12        Q.    Ms. Abraham, you said that you asked

13   around a little bit.  Who did you ask?

14             MR. KELLY:  Objection, asked and

15             answered.

16        Q.    Who did you ask?

17        A.    People who knew these people.

18        Q.    Who are those people who knew these

19   people.  Can you give me a name?  Who did you

20   ask?

21        A.    A while back I did ask Ron Hillard

22   once earlier on --

23        Q.    Okay.

24        A.    -- but he didn't want to have

25   anything to do with it.  That's -- that left me

91

```
 1                         ABRAHAM
 2     stumped.
 3          Q.    So, he refused to give you the
 4     information you asked him for?
 5          A.    He either refused or didn't have it.
 6          Q.    Which?
 7          A.    I don't know.
 8          Q.    Well, you talked to him and you
 9     asked him for information.
10          A.    Right.  I don't know if he has it or
11     not.
12          Q.    Did he refuse or --
13          A.    Well, he didn't -- he didn't -- I
14     don't think -- I don't know if he has it or
15     not, but he's -- he wasn't interested in
16     dealing with the subject at all.
17          Q.    So, he refused to answer your
18     questions?
19          A.    Okay.
20          Q.    Right?
21          A.    Yeah, put it at that.
22          Q.    So, in order for to us find out if
23     he has access to that information, we've got to
24     call him at (334) 375-7699; right?
25          A.    Yes.
```



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

92

ABRAHAM

1

2      Q.    What is a phone number that I might

3   reach you at?

4      A.    (718) 986-4055.

5      Q.    You may reach me at -- I'll give you

6   my card.

7      A.    Oh, good.  It's easier.

8      Q.    It has both my office and cell phone

9   numbers on it?

10      A.    Good.

11            (Handing.)

12      Q.    And I would ask that you call at any

13   time that you have any information or any

14   question about what information we need.

15      A.    Okay.

16      Q.    And I'll be happy to report to

17   Mr. Kelly every time that you call me, or

18   whatever, and whatever we talk about.

19      A.    Okay.

20            MR. KELLY:  I'll do likewise.

21      Q.    And Mr. Kelly will do likewise.

22      A.    Okay.

23            MR. SCHLEGEL:  Thank you very much.

24            MR. KELLY:  I just have a couple of

25            more follow-ups.



93

1                          ABRAHAM

2    FURTHER EXAMINATION

3    BY MR. KELLY:

4         Q.    When you spoke to Mr. Hillard today,

5    did he tell you where he was, if he was in New

6    York or if he was in Massachusetts?

7         A.    No, he didn't mention it.

8         Q.    Do you have an understanding of

9    where Mr. Hillard is currently located?

10        A.    I would guess -- I guess New York

11   right now, but he said he's working for a

12   company in Alabama, so I don't know.

13             MR. SCHLEGEL:   What company is that?

14             THE WITNESS:   I don't know.

15             MR. SCHLEGEL:   Do you know the

16        nature of the business?

17             THE WITNESS:   No.

18        Q.    Did you ask him if he would be

19   willing to come in for a deposition for to us

20   ask him questions?

21        A.    No, I didn't ask him.

22        Q.    What is your feeling as to what his

23   answer would be if we did ask him?

24             MR. SCHLEGEL:   Object to the form of

25        the question, but subject to the



DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

94

1                          ABRAHAM

2          objection, she can answer.

3          Q.    You can answer.

4          A.    I don't think he's very interested.

5     I don't think he's interested in this whole

6     issue.

7                    MR. KELLY:  Okay.

8                    MR. SCHLEGEL:  Okay, thank you.

9               We'll be in touch on your search for these

10              records.

11                   THE WITNESS:  Okay.

12                   THE VIDEOGRAPHER:  Do all parties

13        want to go off record now?

14                   MR. KELLY:  Yes.

15                   MR. SCHLEGEL:  Yes.

16                   THE VIDEOGRAPHER:  Going off record

17        at 12:10 p.m.  End of Tape 2.

18                   (Whereupon, at 12:10 p.m., the

19        Examination of the witness concluded.)

20                   (Thereupon, in an off-the-record

21        discussion, the witness waived review and

22        execution of the transcript.)

23

24

25

95

1

2                        E X H I B I T S

3      PLAINTIFF'S EXHIBITS:

4      EXHIBIT              EXHIBIT                        PAGE
       NUMBER               DESCRIPTION
5
          1     Three-page printout from data-           3
6               base

7         2     One-page advertisement                   3

8         3     One-page advertisement                   3

9         4     One-page advertisement                   3

10        5     Copy of a check                          3

11        6     One-page fax to Kevin Wilson from  3
                Casey Bowes, dated November 7, 2005
12
          7     Copy of a two-page letter under    3
13              the letterhead of Eric J. Moore,
                addressed to Finish Thompson, Inc.,
14              dated November 4, 2005

15        8     One-page fax to Kevin Wilson from  3
                Casey Bowes, dated November 9, 2005
16

17

18                       I N D E X

19     EXAMINATION BY                              PAGE

20     MR. KELLY                            4, 82, 93

21     MR. SCHLEGEL                            37, 90

22

23

24

25

       DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY

96

1

2                    INFORMATION AND/OR DOCUMENTS REQUESTED

3      INFORMATION AND/OR DOCUMENTS              PAGE

4      When Ms. Abraham paid the telephone        70
       back in October, 2005 when the fax was
5      sent, whether the bill was paid by
       check or over the internet
6
       List of telephone numbers being used   70-71
7      in October, 2005

8      What telephone lines sent out the         72
       subject fax and to whom was it sent
9

10

11                    QUESTIONS MARKED FOR RULINGS

12                           (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25

97

1

2                    C E R T I F I C A T E

3      STATE OF NEW YORK        )

4                         :  SS.:

5      COUNTY OF KINGS          )

6

7           I, LEONARD SWEET, a Notary Public for

8      and within the State of New York, do hereby

9      certify:

10          That the witness whose examination is

11     hereinbefore set forth was duly sworn and that

12     such examination is a true record of the

13     testimony given by that witness.

14          I further certify that I am not related

15     to any of the parties to this action by blood

16     or by marriage and that I am in no way

17     interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand this 17th day of September, 2008.

20

21                    _Leonard Sweet_

22                    LEONARD SWEET
                       Court Reporter

23

24

25

DIAMOND REPORTING 718-624-7200 16 Court St., B'klyn, NY



## Ryan M. Kelly

| | |
|---|---|
| **From:** | Ryan M. Kelly |
| **Sent:** | Monday, October 13, 2008 3:02 PM |
| **To:** | 'Caroline Abraham' |
| **Subject:** | FW: Request for documents |

The parties are considering filing a Rule To Show Cause against you.  This will require you to explain to the judge why you haven't retrieved the documents requested.  Please let me know when I can expect the documents.

Ryan M. Kelly
Anderson + Wanca
3701 Algonquin Rd., Suite 760
Rolling Meadows, IL 60008
(847) 368-1500 ph
(847) 368-1501 fax
rkelly@andersonwanca.com

**From:** Ryan M. Kelly
**Sent:** Wednesday, October 08, 2008 3:21 PM
**To:** 'Caroline Abraham'
**Subject:** FW: Request for documents

I have a very impatient judge and he wants these documents retrieved as soon as possible.  When can I expect them?

Ryan M. Kelly
Anderson + Wanca
3701 Algonquin Rd., Suite 760
Rolling Meadows, IL 60008
(847) 368-1500 ph
(847) 368-1501 fax
rkelly@andersonwanca.com

**From:** Ryan M. Kelly
**Sent:** Monday, October 06, 2008 2:52 PM
**To:** 'Caroline Abraham'
**Cc:** Brian J. Wanca
**Subject:** Request for documents

As you know, on September 16, 2008, three depositions took place wherein requests for documents and other information were made by the parties.  You were asked to obtain the following information:

1) All telephone and billing records for Business to Business Solutions
2) The name, address, and telephone number of Martha Escobar's printing business in Baldwin Hills, California
3) The address of the "Rutland location" where the computers were stored
4) The address of the "Wilshire Blvd. location" where the computers were stored
5) The last known address and e-mail address for Ron Hillard
6) The last known address, phone number, and e-mail address for Kevin Wilson
7) The e-mail address for Christina Page
8) The phone number of Kevin Wilson's parents' house

Please provide these documents and information as soon as possible.


Ryan M. Kelly
Anderson + Wanca
3701 Algonquin Rd., Suite 760
Rolling Meadows, IL 60008
(847) 368-1500 ph
(847) 368-1501 fax
rkelly@andersonwanca.com